Hawkins, J.,
delivered the opinion of the Court.
This cause was heard upon bill and answer, at the October Term, 1866, of the Chancery Court at Dan-dridge, and from the decree of the Chancellor, dismissing the bill, complainants have appealed to this Court.
The facts necessary to be recited, are as follows: In March, 1863, complainants borrowed of defendant, Sharp, $700, in Confederate Treasury notes, in consideration of which, they executed to Sharp, their note, due at twelve months. And, at the same time, to secure and make certain the payment of the same, complainants executed and delivered a deed of conveyance, by which, they conveyed to defendant, Eckles, in trust, three several tracts of land, and by which it was provided, that said Trustee, upon being notified, after giving notice, might proceed to sell said land to the highest bidder, for cash, and apply the proceeds to the satisfaction of said note, etc.
On the 13th of November, 1865, the complainants and defendant, Sharp, verbally agreed to refer the settlement of all disputes between them, to the arbitrament *278 and award of F. W. Taylor and L. F. Luper, who proceeded to make their award in writing, dated November 13th, 1865, which recites upon its face: “The parties being present, and a. full statement by the parties to us, that said money was Confederate money, loaned, etc.; and we being instructed to settle said controversy agreeable to law and equity; and after fairly understanding said matter in dispute, are of opinion, that, for the seven hundred dollars, with interest from the 26th of March, 1863, to the 26th of November, 1865, ought to be satisfied in full, by the payment of five hundred and forty-eight dollars and ten cents, in greenbacks; which opinion, is our award in the same.”
Afterwards, and on the 29th of June, 1866, Sharp having notified Eckels, as provided by said trust deed, Eckels, the Trustee, proceeded to advertise said lands for sale, for the purposes of said trust; and on the 11th of July, 1866, complainants filed this bill, for the purpose of restraining said Trustee from selling said lands, and for general relief.
The defendant, Sharp, in his answer, insists that complainants should be repelled from a Court of Chancery, because they were partieeps criminis in the transaction ; and, therefore, entitled to no status in a Court of Equity. He also insists, that this is an executed contract, and therefore the complainants are not entitled to relief. It does not appear from the record, upon what ground the Chancellor based his decree, dismissing the bill, but we are told in argument, it was upon two grounds:
*279 1st, That the complainants were paHieeps criminis to an illegal transaction, and must, for that reason, be repelled.
2d, That having submitted the matters in dispute, to arbitrators, they must abide the award.
Touching the first ground assigned as the basis, or reason of the Chancellor’s decree, this case falls clearly within the principles of the case of Humes, Adm’r, et als. vs. Ward and Yerger, decided by this Court at Jackson, in 1866. In that case, it appeared that one Storer, on the 17th of May, 1862, borrowed from Ward, the sum of $12,000, in Confederate Treasury notes, in consideration of which, he executed hiá note, due at two years, for $14,000, and on the same day, executed a deed, by which he conveyed to Yerger, in trust, certain real estate. It was provided by said deed, that if Storer failed to pay said note at maturity, the Trustee, after giving notice, might proceed to sell said property, for the purpose of paying the trust debt. Storer having failed to pay said note at maturity, the Trustee gave notice, and was proceeding to sell the property. Storer having died in the mean time, Humes, his administrator, with the Will annexed, and others, filed their bill in the Chancery Court at Memphis, against Ward and Yerger, praying that said sale be enjoined; said note declared void, because of the illegality of the consideration; and that said trust deed be cancelled, etc.
The Chancellor, upon grounds of public policy, granted the relief prayed for, and upon an appeal to this Court, the decree was affirmed.
*280 There seems to have been considerable fluctuation of opinion, both in Courts of Law and Equity; but, according to the more modern authorities, in general, when parties are concerned in illegal agreements, or other transactions, whether they are mala prohibita, or mala in se, Courts of Equity, following the rule of law as to participators in a common crime, and acting upon the known maxim, In pari delicto potior est conditio defendentis, et possidentis, will not interpose to grant any relief, but will leave the parties where it finds them, giving no relief to either party, or countenance transactions of this sort. This, however, it seems, is not a rule of universal application: 1 Story’s Eq. Jurisprudence, sec. 298, and note 3.
We have repeatedly holden, that Confederate Treasury Notes were issued and put in circulation, without authority of law, contrary to public policy, and for unlawful and treasonable purposes. They were issued and put in circulation for the purpose of supporting and carrying on an armed rebellion against the Constitution, laws and Government of the United States, within .the territory of the United States, and, upon their face, were payable six months after the recognition of the independence of the Confederate States of America. All persons who voluntarily received or paid them out as currency, or a circulating medium as money, or the •representatives of property, were chargeable with full notice of the purpose for which they had been issued and put in circulation; and in receiving and passing '•said notes, thus gave countenance, aid and support to the rebellion, by giving credit and currency to the very *281 means which furnished the life-blood of the rebellion. There is a well defined distinction as to the nature and extent of the relief which will be granted to persons who are parties to agreements and other transactions against public policy, and, therefore, to be deemed parti-ceps criminis, and that which will be granted to parties to agreements, illegal, merely, because they are mala pro-Tiibita, or mala in se. In cases where agreements or other transactions are repudiated, on account of their being against public policy, the circumstance that the relief is asked by a party who is particeps criminis, is not in equity material. The reason is, that the public interest requires that relief should be given, and it is given to the public through the party; and in these cases, relief will be granted, not only by setting aside the agreement or other transaction, but also, in many cases, by ordering a re-payment of any money paid under it: 1 Story’s Eq., sec. 298, and notes 1 and 2. All contracts founded upon, or in consideration of, Confederate Treasury Notes, by which credit, value, or currency was given to them, are tainted with the original unlawful, treasonable purpose for which they were issued and put in circulation; and are, therefore, not only illegal because mala in se, but because they are against public policy, and, therefore, the public interest demands that such contracts should be discouraged and declared void; and thus, that relief be given to the public through the party asking it, although such party be particeps crimi-nis, or in pari delicto.
In such cases, however reprehensible the acts of the-parties may be in entering into the contract, and after- *282 wards invoking the active interposition of a Court to relieve them from such contract, it is, nevertheless, the imperative duty of the Court, to interpose and give the relief in support of a great public policy.
But, it has been argued, in several cases, before this Court, that public policy requires that these contracts be upheld and enforced by the Courts, upon the ground that for several years, embracing the period of the continuation of the recent rebellion against the Government of the United States, Confederate Treasury Notes constituted the principal circulating medium among those engaged in the rebellion, and formed the basis of many contracts entered into during that period.
This argument originates in a mistaken apprehension of what constitutes public policy, and is wholly fallacious. Let the proposition be but once truly and logically stated in the light of reason and authority, and surely none can be so blind to inevitable conseqences, or so lost to all the convictions of an enlightened patriotism, or of a comprehensive philanthropy, as to insist for one moment, when not only the stability, but the very existence itself, of a great and free Government, such as that of the United States, occupying a proud position in the front rank among the nations of the earth, and spreading her mantle of protection over the lives, liberties and fortunes of the millions of her innocent people, as a nation is placed in the balances, and weighed against the private, pecuniary interests of a portion of her people, springing out of and resting solely upon contracts, the consideration of which was an illegal currency, issued and circulated for no other purpose, than that of *283 aiding in the accomplishment of a treasonable enterprise, by which it was sought to dismember and destroy that Government, that an enlightened public policy, looking not only to the present, but far into the future, requires that such contracts be sanctioned and enforced by the courts of the country; and thus such enterprises stimulated and encouraged war, though it be at the sacrifice of billions of treasure, rivers of blood, and the peace, happiness and prosperity of the nation.
How can a Court, sitting under the authority of that Government, hesitate for one moment, under such circumstances, in an effort to ascertain the requirements of public policy? But, it is insisted, that public policy requires that a party, voluntarily and understandingly entering into a contract, should, in good faith, be held to the performance of said contract. As an abstract principle, that is true, when such contracts are founded upon a good consideration, and are not, of themselves, illegal, or against public policy. It will not be insisted, that an illegal contract, or one unsupported by either a good or valuable consideration, can be enforced; and while public policy does require the faithful performance of all lawful contracts, based upon either a good or valuable consideration, it also imperatively requires, that the laws of the land be observed, the integrity of the Government, the morals, peace, and happiness of her citizens be preserved, and that all criminal transactions or enterprises, by which these are wantonly and wickedly imperiled, shall be discouraged and punished; and hence, Courts will not always content themselves with simply withholding their aid from parties seeking *284 the enforcement of an illegal contract, because it is il- . legal, and the party applying for the relief be partieeps eriminis;. but, in cases where the contract is not only illegal, but contrary to public policy, they will go one step further in aid of the public interest, and give relief against such contract, even though the party applying was- a partieeps eriminis.
It is also insisted, that public policy, as well as justice to - parties, require, that, inasmuch as Confederate Treasury Notes were depreciated, and worth less in the market than lawful currency, that all contracts founded thereon, ought to be scaled, and the consideration reduced to the value, in lawful currency, of so many dollars of such notes, and to that extent enforced.
Now, upon what principle of law, we would ask, can this proposition be maintained? Certainly not upon the hypothesis, that these notes constituted a valuable legal consideration; for, in that case, we apprehend, no authority can be found which will authorize such practices as indicated by the proposition, except in cases where the promise was to pay so much in such notes; and in that case, the party would only be entitled to recover, upon breach of the contract, the value, in legal tender currency, of the stipulated amount of such notes. Neither can it be maintained upon the hypothesis, that such notes were issued and put in circulation, illegally and contrary to public policy; for, in that case, they would not only be void, but, as we have already seen, all contracts and transactions founded on such consideration, are tainted with the original, illegal and treasonable purpose for which they were issued and put in cir- *285 dilation, and, consequently, contrary to public policy. Such a practice would involve the Court- in the legal absurdity of either setting aside the contracts which the parties have made for themselves, and making other and different contracts for them, and enforcing such new and different contracts, to which they never consented; or, of holding, that, although the contract is. wholly void, because founded upon an illegal consideration, and ^contrary to public policy; yet, inasmuch as illegal currency, as compared with legal currency, was worth something in the market, we will so far disregard that public policy, as to institute an inquiry to ascertain what such currency was worth in the market, and, to that extent, hold the consideration good, and the contract valid. It is palpable, the direct result would be, to give value to such currency, and validity to contracts, contrary to public policy, and thus, in violatiou of the high and solemn duty we owe to our Government, establish a precedent, giving judicial sanction and encouragement to treason and rebellion. Surely none would insist upon such a proposition.
But, it is insisted, this is an executed contract; and this Court has repeatedly holden, that, notwithstanding Confederate Treasury Notes formed the basis of a contract, if such contract were executed, for the repose of society, we would not disturb it.
Contracts are distinguished into executed and execu-tory contracts. An executed contract is one in which nothing remains to be done by either party. An execu-tory contract is a contract to do some future act.There is, also, a class of contracts partaking of the na *286 ture of Loth executory and executed contracts, as when a portion of a contract is entirely performed, and a portion of the consideration paid, and still another remains to he completed, and its equivalent consideration to be paid. A contract may be executed on one side and ex-ecutory on the other: Story on Contracts, secs. 18, 19, 20.
From this brief definition of executed and executory contracts, it is clear this is not an executed contract, but is executory. But, assuming the co.ntract to be illegal for the reasons before shown, there is still another reason why the complainants should not be repelled.
It does not follow, that, because both parties are in delicto, concerning an illegal act, they, therefore stand in pari delicto; “for there may be, and often are, different degrees in their guilt: one .party may act under circcmstances of oppression, imposition, hardship; under influences, or great inequality of condition or age, so that his guilt may be far less in degree, than that of his associate in the offense:” 1 Story’s Eq., sec. 300, and note 2. And Courts of Equity have recognized and applied this distinction, in cases of usury. The borrower has been significantly called the slave of the lender; and as to being particeps criminis, ho stands in vinculis, and is compelled to submit to the terms which oppression and his necessities impose upon him. Equity regards the borrower as the party under oppression, and impelled by hardship and necessity-; and in such case, even though the contract is illegal, it can, in no just sense, be said that he is in pari delicto with the lender.
*287 It is further insisted, that, notwithstanding the consideration for the note was illegal, and the contract contrary to public policy, yet, the parties having voluntarily submitted the matter in dispute, to arbitration, they are bound by the award, and the defendant, Sharp, is entitled to the sum stipulated in the award. Such a proposition cannot be maintained, upon either principle or authority. So to declare the law, would be to hold, that by the device of resorting to this domestic tribunal, public policy, and the interests of the public, under the Constitution, Laws and Government of the United States, may be defeated and ignored, and a policy wholly inimical thereto, substituted, which the Courts of the country are bound to enforce. No one can fail, for one moment, to see how pernicious such a precedent would be. It would directly indicate to all, who, in the future, might conceive the design of conspiring for the overthrow of public morals and religion, the destruction of the peace and happiness of society, or for the subversion of the Government, or the usurpation of its powers, that, notwithstanding such conspiracy and every thing which may be done in furtherance of such designs, is unlawful and contrary to public policy, yet, within their own precincts, is to be found a convenient means, by which they may readily cheat the law, defeat public policy, and give validity to their contracts, however violative of public policy, or however prejudicial to the public interest, entered into in aid of the conspiracy. A proposition so repugnant to all our conceptions of public policy, and of the spirit and majesty of the law, cannot, for one moment, be entertained.
*288 The award, upon its face, shows that the consideration of the note was Confederate Treasury Notes; and this note forms the basis of the award. It was an effort upon the part of the arbitrators, to do that which was not only forbidden by law, but which the parties themselves could not lawfully do. It is, therefore, simply void, and forms no obstacle to the relief sought by complainants. See Peck’s Rep., 93, and authorities cited; the principles of which, have been twice approved by this Court, during the present term, in the cases of Fain et al. vs. Headerick et al.
The decree of the Chancellor is erroneous, and must be reversed. The complainants are entitled to a decree, declaring the note and trust deed both void, and making the injunction heretofore granted, perpetual.